IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-00375-MSK

ESTELA GANDARILLA,

       Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

       Defendant.

---

## ORDER VACATING THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND REMANDING THE CASE

---

THIS MATTER comes before the court pursuant to Plaintiff's Brief (**# 11**) in support of her appeal from the Commissioner of Social Security's (the "Commissioner's") final decision denying her application for disability insurance benefits and supplemental security insurance, and Defendant's Response Brief (**# 12**).

**I.    Jurisdiction**

This court properly exercises jurisdiction under 42 U.S.C. § 405(g).

**II.    Material Facts**

Plaintiff was born in Mexico on August 12, 1963. She completed six years of school in Mexico, and came to the United States in or around 1984. In the relevant past, Plaintiff worked from 1993 to 2003 as an assembly line worker and hand packager. Plaintiff alleges that she

-1-

became disabled on August 1, 2003, at the age of 39, due to pain from carpal tunnel syndrome.[1]

Plaintiff's medical records reveal a long history of bilateral carpal tunnel syndrome.

### A. Medical History

#### 1. Pre-Onset History

The record demonstrates that Plaintiff began experiencing pain in her hands and wrists in 1994, but sought only limited treatment from 1994 to 1995, and no treatment from 1995 to 2000. In February 2000, Plaintiff presented to Rehabilitation and Performance Medicine Specialists, Ltd. ("RPMS"), where she began participating in physical therapy sessions under the care of rehabilitation specialist Dr. Joseph Fillmore. During her first visit to Dr. Fillmore on February 11, 2000, Plaintiff reported tingling in her fingers and pain in her hands. Dr. Fillmore's reports reflect that Plaintiff continuously reported numbness, tingling, and pain during her visits from February 2000 through May 2000.

Plaintiff underwent carpal tunnel release surgery on her right wrist in May 2000 and on her left wrist in August 2000, after which Plaintiff participated in occupational therapy and began working on modified duty. In September 2000, Plaintiff presented to Dr. Peter Johnson, complaining of tenderness around the surgical sites on her wrists. Dr. Johnson noted that Plaintiff had a good range of motion and noted no obvious swelling, inflammation, or signs of infection. Dr. Johnson ordered Plaintiff to continue therapy. Plaintiff complied, and continually reported pain, soreness, and numbness in her therapy sessions through October 2000.

---

[1]The record also reflects that Plaintiff has received treatment in the past for depression, hyperthyroidism, and arthritis. However, these impairments did not form a basis of the administrative law judge's determination and are not mentioned in the briefing currently before the Court. Accordingly, the Court need not discuss these impairments in detail.

On November 8, 2000, Plaintiff underwent a physical therapy session at RPMS. Notes from the session indicate that Plaintiff had "improved overall, however [her] outcome [was] not as good as [] anticipated" and that she had had "poor success" returning to work. On November 9, 2000, Dr. Fillmore performed a functional capacity evaluation and impairment assessment on Plaintiff. Dr. Fillmore noted that Plaintiff's then-current work restrictions were: (1) no repetitive work; (2) limited use of both hands; and (3) no pushing, pulling, or lifting of weights greater than 10 pounds. Dr. Fillmore found that, although she exhibited inconsistencies during testing, Plaintiff was symptomatic for carpal tunnel syndrome and her condition was stable. He opined that she would likely be able to work with restrictions similar to the aforementioned, then-current restrictions along with the additional restrictions of frequent breaks, limited pinching movements, and no grasping small objects.

In February 2001, Plaintiff presented to Dr. Randolph Pock, for a psychiatric examination, which Dr. Pock conducted in Spanish. Dr. Pock noted that Plaintiff described experiencing dull pain in both wrists and hands and numbness and coldness in her fingers. He noted that Plaintiff was then working approximately 40 hours per week for her employer and that Plaintiff stated her English language abilities were "somewhat limited," "[d]espite passing the [United States] citizenship test."

In March 2001, Plaintiff underwent electromyography testing, the results of which showed persistent mild-to-moderate carpal tunnel syndrome. On August 31, 2001, Plaintiff presented to Dr. John Aschenberger, another rehabilitation specialist at RPMS, for a functional capacity evaluation. Dr. Aschenbeger opined that Plaintiff had achieved maximum medical improvement with regard to her impairments and that she could perform sedentary work with

occasional lifting of no more than 10 pounds and no repetitive pinching, gripping, or wrist bending. Like Dr. Fillmore, Dr. Aschenberger noted inconsistencies in Plaintiff's testing and found "symptom magnification" to be evident.

On February 27, 2002, Plaintiff presented to Dr. Patrick Miller for examination. Dr. Miller noted his suspicions that Plaintiff did not exert full effort in undergoing the physical tests he performed on her. Nonetheless, he diagnosed Plaintiff with bilateral carpal tunnel syndrome, opined that she had reached maximum medical improvement, and found she had a 20% whole person impairment rating due to her symptoms.

From October 2002 through April 2003, Plaintiff visited physical medicine and rehabilitation specialist Dr. J. Scott Bainbridge for follow-up treatment based on Dr. Miller's recommendations. In his notes from Plaintiff's initial visit on October 29, 2002, Dr. Bainbridge reported that Plaintiff was no longer working in assembly and had not done so since her surgeries in 2000. He reported further that Plaintiff was working full-time in packaging and related jobs, and could successfully complete her job functions, albeit with some pain. He noted the presence of an interpreter during the appointment, and expressed his intentions to refer Plaintiff to a Dr. Naverette, who spoke Spanish. Dr. Bainbridge's notes from visits with Plaintiff from December 2002 through February 2003 all reflect the fact that Plaintiff was working and his opinion that Plaintiff could continue to work. In April 2003, Dr. Bainbridge noted that Plaintiff had achieved maximum medical improvement and opined that she could continue to work in her position.

### 2.    Post-Onset Medical History

Plaintiff's earliest medical records dating after August 1, 2003 are treatment notes from a

February 2004 visit to Dr. H. David Wu.  The record reveals that Plaintiff visited Dr. Wu with relative frequency for carpal tunnel treatment from February 2004 through October 2005.

In October 2004, with the aid of an interpreter, Plaintiff underwent an examination performed by Dr. Edward Manring, a consultative examiner for the Social Security Administration ("SSA").  Dr. Manring found that Plaintiff had pain, numbness, tingling, and weakness in her hands as well as moderate difficulty with grasp and manual dexterity due to carpal tunnel syndrome.  Dr. Manring opined that although Plaintiff probably could not perform repetitive assembly line work, there was "no objective finding that would preclude light manual labor."

On October 14, 2005, Dr. Wu wrote a letter in which he opined that Plaintiff was "unable to do work with her hands of any sort due to her carpal tunnel."  Dr. Wu based this opinion on "general observations," rather than "specific motor skill tests."

In February 2006, Plaintiff underwent an orthopedic evaluation, performed by SSA consultative examiner Dr. Peter Weingarten.  After examining Plaintiff, Dr. Weingarten expressed his doubts that Plaintiff extended "full effort" during the evaluation, and suggested that her subjective symptoms were exaggerated as compared to his objective findings.  Nonetheless, Dr. Weingarten opined that Plaintiff suffered from chronic pain and would not be capable of repetitive use of her hands.  Dr. Weingarten opined further that Plaintiff could lift up to 20 pounds and would be capable of performing in the workplace.

On May 9, 2006, Dr. Brett Valette, an examiner for the SSA, performed a psychological examination on Plaintiff with the aid of an interpreter.  Dr. Valette noted that because of "the interpreter situation," some of Plaintiff's testing was not valid, but found that Plaintiff showed no

evidence of major depression and had a global assessment functioning ("GAF") score of 70-75.[2]
Dr. Valette opined that Plaintiff's "main difficulty" was pain in her hands and wrists.

## B.    Procedural History

On May 14, 2004, Plaintiff filed an application for disability benefits.  On the application form, Plaintiff identified herself as unable to speak English and indicated that her son Margarito completed the form.  The SSA denied Plaintiff's application.  On December 15, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ").  The ALJ held two hearings, a purely administrative hearing on April 25, 2006 and a hearing at which Plaintiff and a vocational expert ("VE") testified on August 23, 2006.

At the August 2006 hearing, Plaintiff, aided by a translator, testified that she lived with her husband and four children.  Through her attorney, she explained that she had sustained a repetitive motion injury while working in an assembly manufacturing factory in 1995, but continued working through 2003.  She stated that her carpal tunnel syndrome caused her to experience problems, including pain and numbness in her hands and difficulty dressing herself, washing her hair, and performing household chores such as cleaning and cooking.

Regarding her language skills, Plaintiff testified that she had been in the United States for 22 years and was a naturalized citizen, but could speak only "very little" English.  She testified that the citizenship examination consisted of answering six questions and writing a short

---

[2]The GAF scale is a tool for rating an individual's social, occupational, and psychological functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000).  A GAF between 70 and 75 is indicative of an individual who, if symptoms are present, experiences transient and expected reactions to psychosocial stressors and has no more than slight impairment in social, occupational, or school functioning.  *Id.*

sentence in English, and that she studied materials in Spanish and English to prepare for the examination. Plaintiff stated that although she was able to drive, she read few street signs and mostly recognized them by their shape. After taking this testimony, the ALJ stated that Plaintiff's ability to communicate in English was not known, and "not disclosed well." The record is not clear, but it appears that Plaintiff's attorney then asked her questions in English, to which Plaintiff responded in Spanish. After several questions, the ALJ observed that Plaintiff had "not grasped [the] language of the United States since she has been here."

The VE testified at the hearing regarding her review of Plaintiff's records. The VE noted Plaintiff's former relevant jobs were unskilled positions, requiring light to medium exertion levels. The VE opined that a hypothetical individual similarly situated to Plaintiff in age and education, who: (1) could not read or write English; (2) could occasionally lift 20 pounds; (3) could not perform repetitive motions; and (4) had manipulative functional limitations in reaching, handling, fingering, pushing, and pulling could not perform Plaintiff's former work. The VE opined that – so long as the hypothetical individual could engage in "minimal communication" in English, "at least verbally" – the individual could perform work as an usher, school bus monitor, or hostess. At the ALJ's prompting, the VE explained that "minimal communication" in English, for the purpose of these jobs, would require knowledge and use of relatively simple phrases that could be learned within 30 days. The VE opined that an individual with the above-described physical and educational description who could not communicate in English at all could not perform any jobs.

On October 20, 2006, the ALJ issued a decision reflecting his findings that Plaintiff was not disabled within the meaning of the Social Security Act and denying Plaintiff's request for

benefits.  In reaching his conclusion, the ALJ found that Plaintiff had not engaged in substantial gainful activity "at any time relevant" to his decision.  The ALJ next determined that Plaintiff's depression, hyperthyroidism, and arthritis were not severe impairments, but her bilateral carpal tunnel syndrome was a medically determinable, severe impairment.  The ALJ then found that Plaintiff's carpal tunnel syndrome was not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation Number 4 (the "Listings").  Additionally, the ALJ found that Plaintiff's statements concerning her impairments and her ability to work were "not entirely supported by the weight of the evidence," in light of Plaintiff's description of her activities and lifestyle and discrepancies between Plaintiff's statements concerning her abilities and the record evidence.  Based on the evidence presented, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to lift up to 20 pounds and to reach, handle, finger, feel, push, and pull occasionally.  The ALJ opined that Plaintiff should avoid jobs requiring repetitive, "assembly line type work."

Further, the ALJ noted that Plaintiff was "unable to communicate effectively or read and write in English" and opined that Plaintiff should avoid jobs requiring that she read or write in English.  Citing the VE's testimony, the ALJ found that, despite her language limitations, Plaintiff could perform full time light work as a school bus monitor, usher, or hostess.  The ALJ opined that Plaintiff could learn essential English phrases in 30 days to perform these jobs.  The ALJ reasoned that Plaintiff could understand English "fairly well," could speak a little English, and would have familiarity with the types of English phrases she would need to learn after having been in the United States for many years.  Finally, the ALJ reasoned that Plaintiff: (1) had taken an examination to become a United States citizen, which would have required some

common English; (2) had studied for the citizenship examination in both Spanish and English;

and (3) could drive and read some street signs.

On December 28, 2007, the Appeals Council denied Plaintiff's request for review of the

ALJ's decision, thereby making it the final administrative decision for the purposes of judicial

review. On February 22, 2008, Plaintiff filed a timely complaint in this Court challenging the

Commissioner's denial of benefits.

## III.   Analysis

### A.     Standard of Review

Judicial review of the Commissioner's determination that a claimant is not disabled

within the meaning of the Social Security Act is limited. *Hamilton v. Sec'y of Health and*

*Human Servs.*, 961 F.2d 1495 (10th Cir. 1992). Section 405(g) of the Social Security Act

establishes the scope of this Court's review of the Commissioner's denial of benefits. *See* 42

U.S.C. § 1383(c)(3) (incorporating provisions of 42 U.S.C. § 405(g)). This Court's review is

limited to determining whether the Commissioner applied the correct legal standard and whether

the Commissioner's decision is supported by substantial evidence. *Brown v. Sullivan*, 912 F.2d

1194, 1196 (10th Cir. 1990). Substantial evidence is evidence a reasonable mind would accept

as adequate to support a conclusion. *Id.* It requires more than a scintilla of evidence but less

than a preponderance of the evidence. *Hedstrom v. Sullivan*, 783 F. Supp. 553 (D. Colo. 1992).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes

mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Finally, this

Court must meticulously examine the record, but it may not weigh the evidence or substitute its

discretion for that of the Commissioner. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir.

1993).

**B.      Evaluation of Disability**

The criteria to obtain disability insurance benefits under the Social Security Act are that a claimant meets the insured status requirements, is younger than 65 years of age, and is subject to a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [that] can be expected to result in death or [that] has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a five-step sequence for evaluating disability.  *See*  20 C.F.R. § 404.1520(b)-(f)*; Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step analysis).  If the ALJ determines that a claimant is or is not disabled at any point in the sequence, the analysis ends.  *Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799 (10th Cir. 1991). First, the claimant must demonstrate that he or she is not currently involved in any substantial, gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must show a medically severe impairment or combination of impairments that limits his or her physical or mental ability to perform basic work activities.  *Id*. § 404.1520(c).  Third, the claimant must compare his or her impairment to established Listings.  If the impairment matches or is equivalent to the Listings, the claimant is judged conclusively disabled.  *Id.* § 404.1520(d).  If the claimant's impairment does not match or is not equivalent, the analysis proceeds to a fourth step.  *Id.* § 404.1520(e).  At the fourth step, the claimant must show that the "impairment prevents [him or her] from performing work [he or she] has performed in the past."  *Williams v. Bowen*, 844 F.2d 748, 751

(10th Cir. 1988) (citations omitted); *see also* 20 C.F.R. § 404.1520(f). If the claimant is able to perform his or her previous work, he or she is not disabled. If the claimant is not able to perform his or her previous work, the analysis proceeds to a fifth step. At the fifth step, the burden of proof shifts, and the Commissioner must demonstrate: (1) that based on the claimant's RFC, age, education, and work experience, the claimant can perform other work; and (2) the work that the claimant can perform is available in significant numbers in the national economy. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). The ALJ's burden at the fifth step is met if the decision is supported by substantial evidence. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### C.   Disability Determination

Plaintiff does not dispute the ALJ's determinations at steps one through four and does not challenge either the ALJ's finding that her testimony was less than fully credible or the various levels of weight the ALJ accorded to the opinions of medical professionals who treated her. Plaintiff challenges only the ALJ's determination at step five that she could perform work because she could engage in "minimal communication" in English. Plaintiff argues that this finding is not supported by substantial evidence.

Before turning to the substance of Plaintiff's argument, the Court notes that the parties rightly observe that there is no case law precedent directly applicable to the issue presented in this matter. Both parties cite to and rely upon four inapposite cases regarding application of the Medical Vocational Guidelines (known as the "Grids") and assessment of literacy in connection with application of the Grids. For purposes of clarification, the Court notes that the ALJ in this

case correctly did not rely upon or apply the Grids in making his disability determination.[3]

   Further, the Court underscores the distinction between an assessment of literacy and an assessment of the ability to communicate in English.  The regulations require an ALJ to consider both in determining whether a claimant can perform work.  *See* 20 C.F.R. §§ 404.1564(b), 416.964(b).  Although literacy and the ability to communicate in English necessarily overlap, as per the regulations, they are indeed distinct.  *See Delgado v. Barnhart*, 305 F. Supp. 2d 704, 716 (S.D. Tex. 2004) (noting distinction between literacy and ability to communicate).  The regulations define "illiteracy" as the "inability to read or write."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  An individual who can read or write a simple message in English is not considered illiterate.  *Id.*  The regulations indirectly define "a person's ability to communicate in English" as the ability to "speak, read, and understand" the language.  *Id.* §§ 404.1564(b)(5). 416.964(b)(5).  Here, because Plaintiff's arguments concern only her ability to speak and understand English, only her ability to communicate is implicated in this case.

   Plaintiff argues that the various reasons the ALJ cited in his opinion to support his finding that she could engage in minimal communication in English are not supported by substantial evidence.  In support of her argument, Plaintiff points to the general lack of clarity in the record as to her English-speaking skills and challenges the ALJ's contentions that: (1) because Plaintiff took an examination to become a United States citizen in 1996, she must speak and understand some common and ordinary English; and (2) based on the amount of time she

---

[3]As in this case, when a claimant allegedly suffer from pain or other non-exertional impairments, an ALJ cannot prove the existence of jobs the claimant can perform by using the Grids and, instead, must prove such existence through expert vocational testimony.  *Thompson*, 987 F.2d at 1491-92.  Here, the ALJ properly elicited and relied upon a VE's testimony to arrive at his conclusions.

had been in the United States, Plaintiff was accustomed to the sorts of English phrases she would need to learn in order to perform the jobs the VE suggested.  The Commissioner does not respond to Plaintiff's arguments beyond distinguishing the cases that Plaintiff cites.

Given the overall state of the record in this case, it is difficult to conclude that substantial evidence supported the ALJ's determinations regarding Plaintiff's ability to speak and understand English.[4]  As set forth above, Plaintiff identified herself as unable to speak English on her application for social security benefits and appeared at several medical appointments and the hearing before the ALJ with an interpreter.  However, Plaintiff also told a medical professional that her English skills were only "somewhat limited."  The issue was not clarified when the ALJ asked Plaintiff if she spoke "any English at all."  Plaintiff responded "very little," which is ambiguous and cannot serve as substantive evidence to support a determination concerning Plaintiff's actual abilities.  *See Delgado*, 305 F. Supp. 2d at 715 (noting that, with regard to discerning English-speaking capabilities, the answer "'[a] little bit' remains unqualified and undefined").

An apparent attempt to clarify Plaintiff's English language abilities bears out the lack of substantial evidence in the record concerning same.  After the VE opined that a person similarly situated to Plaintiff could perform work as a surveillance system monitor, Plaintiff's attorney objected on the grounds that the jobs would require an ability to communicate in English.  The ALJ responded that it was not clear "what level [Plaintiff's ability to communicate in English] exists at, and it's really not disclosed well."  Plaintiff's attorney then briefly questioned her,

---

[4]In fact, the ALJ's determination that Plaintiff could engage in minimal communication in English seems to be in direct conflict with his determination that Plaintiff was "unable to communicate effectively or read or write in English."

evidently in English, although the record is not clear as to this point.  The questioning, in its

entirety, went as follows:

> ATTORNEY: Ms. Gandarilla, can you read any [sic] article in a newspaper?

> PLAINTIFF:  No, I don't.

> ATTORNEY: Can you understand certain words?  If you read an article in the newspaper, do you understand certain words?

> PLAINTIFF:  (Inaudible)

> ATTORNEY: You're understanding my questions in English, but you're answering me in Spanish?  I got confused there, because I understand them both.

> INT:  Do you want her to respond in English?

> ATTORNEY: Okay.  So do you understand what I'm saying?

> PLAINTIFF:  Yes.

> ALJ:  That's a yes, I take it?

> PLAINTIFF:  Not every word.

> ATTORNEY: Okay.

> ATTORNEY: If you read an article in the newspaper can you understand the article?

> PLAINTIFF:  No.

> ATTORNEY: Did you understand my question?

> PLAINTIFF:  Sí.

> ATTORNEY: Are you certain?

> PLAINTIFF:  I'm not sure if I answered it well.

> ATTORNEY: Okay.  But you're answering me in Spanish, can you tell me why in English or Spanish why you're answering me in Spanish?

PLAINTIFF:   I don't know how to answer that well or correctly, that's why I'm hesitating.

From the record alone, it is impossible to determine the role of the interpreter in this exchange.  How much of the exchange was in English and whether the interpreter translated the attorney's questions or Plaintiff's answers cannot be ascertained.  However, assuming the substance of the attorney's statements to be true, Plaintiff evidently answered in Spanish some or all of the questions posed to her in English.  Plaintiff's answers in Spanish plainly cannot serve as substantial evidence of her ability to speak and communicate in English.

Further, the ALJ's assumption that Plaintiff "would have been required to speak and understand . . . some common and ordinary English" in connection with her examination to become a United States citizen cannot serve as substantial evidence of Plaintiff's abilities to communicate in English.  The record reveals that the ALJ elicited testimony concerning the examination, but the only information he gleaned is that Plaintiff: (1) studied for the examination with materials in English and Spanish; and (2) had to write a sentence in English and answer six questions.  However, the record is silent as to whether Plaintiff understood the English materials she studied, the sentence she wrote, the questions she was asked, or the answers she propounded.  The record is also silent as to the nature and complexity of the materials Plaintiff studied, the sentence she wrote, and the questions she was asked.  This context and substance is essential to be able to determine Plaintiff's abilities to speak and understand English without speculation.  *See Delgado*, 305 F. Supp. 2d at 716 ("The failure to probe the Plaintiff's understanding . . . or inquire more generally regarding his English comprehension is no trifling matter.  It goes to the heart of an assessment of literacy.").

Finally, the mere fact that Plaintiff had lived in the United States for approximately 22

years at of the time of the hearing is not substantial evidence of Plaintiff's English language capabilities. The ALJ's presumption that during that time, Plaintiff would have become "accustomed to [] simple English phrases" is purely an assumption and, therefore, not substantial evidence. *See Roberts v. Barnhart*, 36 Fed. Appx. 416, 419 (10th Cir. 2002) (noting that speculation cannot substitute for substantial evidence). The record is devoid of testimony or other evidence to establish how much or how well Plaintiff can speak and understand English – other than "very little," which, as discussed above, is ambiguous and cannot serve as substantial evidence to support the ALJ's decision.

"When there are gaps in the administrative record," and "further findings or [a] clearer explanation of the decision" are needed, remand is appropriate. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. N.Y. 1996) (citations omitted). Additional questions, testing, or other investigation into Plaintiff's ability to speak and understand English are warranted in this case to develop sufficient substantial evidence.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is **REVERSED** and this matter is **REMANDED** for this purpose.

Dated this 2nd day of March, 2009

**BY THE COURT:**

_____

Marcia S.                                                                      Kr ieger

United States District Judge

-16-